UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| TRINSUM GROUP, INC., f/k/a | : | Case No. 08 B 12547 (AJG) |
| MARAKON ASSOCIATES, INC., and | : |  |
| INTEGRATED FINANCE LIMITED, LLC | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |
|  | : |  |
| MARIANNE T. O'TOOLE, AS DISTRIBUTING | : |  |
| AGENT FOR THE ESTATES OF TRINSUM | : |  |
| GROUP, INC., AND INTEGRATED FINANCE | : |  |
| LIMITED, LLC, | : |  |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : | Adv. Pro. No. 11-01284 (AJG) |
|  | : |  |
| JAMES McTAGGART, BRIAN BURWELL, | : |  |
| RONALD LANGFORD, KENNETH FAVARO, | : |  |
| JOSE LUIS DAZA, DAVID DEMING, NEAL | : |  |
| KISSEL, MASON KISSELL, ROBERTO | : |  |
| MENDOZA, ROBERT MERTON, AND | : |  |
| EUGENE SHANKS, JR., | : |  |
|  | : |  |
| Defendants. | : |  |

_____

### OPINION CONCERNING MOTIONS TO DISMISS AMENDED COMPLAINT

Before the Court are various motions to dismiss certain counts of an amended complaint

filed in this adversary proceeding against directors of a Delaware corporation. The relevant

counts relate to the transfer of certain corporate assets, and seek to hold the directors liable for

monetary damages for alleged breaches of fiduciary duties and corporate waste in authorizing

such transfers.

The Court concludes that the amended complaint does not adequately allege that the

directors breached their duty of loyalty.  The Court further concludes that because there was an exculpation provision in the corporation's certificate of incorporation, as permitted by the law of the state of Delaware, and because the amended complaint does not adequately allege a lack of good faith on the part of the directors, the directors could not be found personally liable for monetary damages for any alleged breaches of the fiduciary duty of care or corporate waste. Therefore, the counts of the complaint at issue should be dismissed.

*Motion to Dismiss Standard*

Federal Rule of Civil Procedure ("Rule") 12(b)(6) is incorporated into bankruptcy procedure by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012(b).  In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief, the court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed.2d 1081 (2007).  In addition, the court draws all reasonable inferences from the factual allegations in favor of the plaintiff. *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992); *Myvett v. Williams*, 638 F. Supp. 2d 59, 64 (D.D.C. 2009).

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92 L. Ed.2d 209 (1986).  Bare assertions, "devoid of 'further factual enhancement'[,]" are not sufficient to withstand a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662,  ___, 129 S.Ct. 1937, 1949, 173 L. Ed.2d 868 (2009) (citation omitted).

The need to provide the "grounds" for entitlement to relief requires "more than labels and

conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65, 167 L. Ed.2d 929 (2007). There must be a "reasonably founded hope" that the discovery process will uncover relevant evidence. *Id*. at 559, 563 n.8, 127 S.Ct. 1967, 1969 n.8.

To adequately support the claim, there must be sufficient facts identified to suggest that the legally vulnerable conduct is plausible. *Id*. at 556, 127 S.Ct. at 1965. A complaint meets the plausibility standard when factual content is pled "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at ___, 129 S.Ct. at 1949. Once the plausibility-standard threshold is met, the complaint survives even if the identified facts seem improbable or recovery is thought to be remote or unlikely. *Twombly*, 550 U. S. at 556, 127 S.Ct. at 1965. Although *Twombly* was decided in the context of an antitrust litigation, the plausibility standard to test the sufficiency of a complaint applies in all civil actions. *Iqbal*, 556 U.S. at ___, 129 S.Ct. at 1953.

Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 555 n.3, 127 S. Ct. at 1965 n.3. However, once the claim is adequately supported, specific facts beyond those needed to state the claim are not necessary. *Id*. at 570, 127 S.Ct. at 1973-74. In determining whether a plausible claim for relief is contained in a complaint, a reviewing court "draw[s] on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950. Many considerations factor into the plausibility determination including, "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *In re Old Carco LLC*, No. 11 Civ. 5039 DLC, 2011 WL 5865193 (S.D.N.Y.

Nov. 22, 2011) (citing *L-7 Designs, Inc. v. Old Navy LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In reviewing a Rule 12(b)(6) motion, a court may consider the allegations in the complaint, exhibits attached to the complaint or incorporated therein by reference, and matters of which judicial notice may be taken. *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). In addition, a court may consider a document of which plaintiff has notice and relied upon in bringing the claim or that is integral to the claim. *Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). However, mere notice or possession of such document is not sufficient. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Rather, a necessary prerequisite for a court's consideration of a document is that the plaintiff relied "on the terms and effect of a document in drafting the complaint." *Id*. As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id*. at 153 n.3 (citation omitted).

In contrast, when assessing the sufficiency of a complaint, a court does not consider extraneous material because considering such material would run counter to the liberal pleading standard, which requires only a short and plain statement of the claim showing entitlement to relief. *Id*. at 154. Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Federal Rule of Evidence 201. *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 357, 357 n.13 (S.D.N.Y. 2003) (citing *Chambers*, 282 F.3d at 153).

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to weigh the evidence

which may be offered to support it.  *Cooper*, 140 F.3d at 440.  The determination is not whether

a claimant will ultimately prevail, but whether the claimant should be allowed to offer evidence

to support the claim.  *Swierkiewicz*, 534 U.S. at 511, 122 S. Ct. at 997.

Thus, for the purposes of the motion to dismiss, the Court accepts as true all of the

material factual allegations in the Complaint filed by the plaintiff.  As such, most of the

following facts are taken from the Complaint and accepted as true solely for the purposes of the

motion to dismiss.

*FACTS*

Marakon Associates, Inc. ("Marakon"), founded in 1978, was a closely held stock

corporation, which operated as a corporate strategy consultancy firm.  Marakon promoted the

view that companies be managed in a way that built long-term value, and its roster of clients

included major corporations.  Marakon had approximately 30 shareholders who referred to

themselves as "partners."  In addition, Marakon had approximately 300 employees operating out

of offices in New York, London, Zurich, and Singapore.  A board of directors (the "Marakon

Directors"), who were its largest shareholders, managed Marakon.  The three most senior and

influential partners were James McTaggart ("McTaggart"), Brian Burwell ("Burwell"), and

Ronald Langford ("Langford").  An additional director of Marakon was Kenneth Favaro

("Favaro," together with McTaggart, Burwell, and Langford, are the referenced "Marakon

Directors").

Integrated Finance Limited, LLC ("IFL") is a corporation organized under the laws of the

State of Delaware, with its principal place of business located in New York, New York.  IFL

operated as an investment banking firm with approximately 70 employees in offices in New

5

York, London and Tokyo.  IFL was formed by three individuals, Roberto Mendoza ("Mendoza")

and Peter Hancock, who were both formerly banking officers, and Robert Merton ("Merton"), a

business school professor and noted economist.  In addition Eugene Shanks, Jr. ("Shanks") was a

member or principal of IFL.

Aside from its investment banking services, IFL had other business lines, including a

pension management software program known as "Smartnest," which it sought to market to

private and public sectors, and the IFL Victoria Fund LP (the "Victoria Fund"), a hedge fund

seeded with Mendoza's own money.

In February 2007, Marakon entered into a business combination with IFL, in which IFL

was merged into Marakon, and the combined entity was renamed Trinsum Group, Inc.

("Trinsum").  Trinsum is a Delaware corporation and includes an exculpation provision in its

amended certificate of incorporation (the "Trinsum Cert."), which protects its directors from

personal liability for monetary damages for breaches of fiduciary duty to the fullest extent

permitted by Delaware Law.  ("Trinsum Cert. ¶ 7).  In the merger transaction, Marakon acquired

the assets of IFL and diluted its stock, thereby giving Marakon control of 51% of the combined

entity and IFL 49%.  Thus, the Marakon Directors retained control of the merged entity and all

of the Marakon Directors were included as directors of Trinsum.  McTaggart was named CEO of

Trinsum.  IFL members, including Mendoza, Merton and Shanks, were also made directors of

Trinsum.  Additional Trinsum directors include Jose Luis Daza ("Daza"), David Deming

("Deming"), Neal Kissel ("Kissel"), Mason Kissell ("Kissell").  (McTaggart, Burwell, Favaro,

Langford, Daza, Deming, Kissel, Kissell, Mendoza, Merton, and Shanks are collectively referred

to as the "Trinsum Directors").[1]

In March 2007, Trinsum transferred its ownership in the Victoria Fund to QFR Capital

Management, L.P. and QFR Capital Group, LLC (together "QFR"), entities created for the

purpose of holding the fund, for 10% of the Fund's revenue stream. Trinsum subsequently sold

the 10% revenue stream for $5.9 million. The entire board of directors of Trinsum, including the

Marakon Directors, appointed Daza, who owns all or part of QFR, as the person to negotiate the

transfer of these assets to QFR. There was unanimous approval by the entire Trinsum board of

Daza's actions. The Complaint includes an allegation that, aside from Daza's work, no other

members of the Trinsum board of directors performed due diligence or sought outside

professional assistance concerning the value of the fund before it was sold to QFR.

Also after the merger, and around the same time as the Victoria Fund transfer, the

Trinsum Directors authorized and directed the payment to certain IFL principals and employees

of approximately $5 million in incentive payments without an obligation to make such payments

and against the protests of the Chief Financial Officer ("CFO") of Trinsum. The Distributing

Agent alleges that the incentive payments were made with Marakon funds.

The merger did not prove successful, according to the Distributing Agent, because

Trinsum, acquired certain additional debt obligations in the merger and IFL failed to generate the

revenue expected. The Distributing Agent also alleges that Marakon and IFL were insolvent

---

[1]Prior to the merger, the Marakon Directors had formed a "Strategy Council," which was comprised of themselves and certain other Marakon directors to consider three (3) options for the development of Marakon: (i) merging with or acquiring a smaller consultancy firm; (ii) becoming acquired by a larger consulting firm; and (iii) remaining independent and attempting to grow the business. Those options were presented to the Marakon partners and ultimately the merger was chosen. There are other allegations in the amended complaint concerning the propriety of the Marakon Directors's conduct in promoting the options, however, they are not relevant to the current motion.

prior to the merger and that the resulting entity, Trinsum, was also insolvent,

On July 3, 2008, an involuntary proceeding was commenced against Trinsum under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). On January 28, 2009 (the "Conversion Date"), Trinsum converted the Trinsum bankruptcy case to one under Chapter 11. Since the Conversion Date, Trinsum has continued to operate and manage its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

On February 24, 2009, IFL filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. On March 6, 2009, the Court entered an order directing Joint Administration of the Trinsum and IFL bankruptcy cases. On November 10, 2010, the Court confirmed the Debtors' First Modified Joint Plan of Liquidation (the "Plan"). On that same date, Marianne T. O'Toole, Esq. was appointed as Distributing Agent (the "Distributing Agent") under the Plan. Pursuant to sections 1.16 and 10.02 of the Plan, the Distributing Agent is authorized to pursue any "claims, suits, actions and causes of action" belonging to the Debtors or their estates.

In the counts of the amended complaint relevant to these motions to dismiss, it is alleged that by authorizing the transfers of the Victoria Fund and the incentive payments for less than reasonably equivalent value, the Trinsum Directors breached the fiduciary duties they owed to the corporation and that such transfers constituted corporate waste.[2] As such, the Distributing Agent seeks to hold the Trinsum Directors personally liable for monetary damages for such alleged breaches.

---

[2] Counts I and II of the Amended Complaint are against the Marakon Directors and concern their conduct leading up to and culminating in the merger. Counts III and IV of the Amended Complaint are directed to the Trinsum Directors and concern Trinsum's transfer of assets after the merger. The current motion to dismiss only involves counts III and IV of the Amended Complaint.

*Procedural Background*

The Distributing Agent initially filed a complaint (the "Initial Complaint") on January 27, 2011. Thereafter, the Marakon Directors and Trinsum Directors filed motions to dismiss the Initial Complaint. On June 21, 2011, immediately prior to the scheduled hearing date on the various motions to dismiss, the Distributing Agent filed a motion seeking to amend the Initial Complaint. On August 10, 2011, the Court granted the motion to amend the Initial Complaint, and, the Distributing Agent filed an amended complaint, dated August 16, 2011 (hereinafter, the "Complaint"), which is the one currently before the Court.

The Court afforded the various defendants an opportunity to supplement their briefing on the motions to dismiss to address any additional issues raised by the amendments, with a scheduling order for the briefing entered on August 18, 2011, and a revised scheduling order entered on August 28, 2011. Thereafter, the parties filed the supplemental briefing.

In addition, after the Court issued an Opinion in another adversary proceeding in the Trinsum bankruptcy cases, which concerned certain similar factual issues, the Distributing Agent filed a motion seeking leave to file a Second Amended Complaint in the instant adversary proceeding. The Trinsum Directors filed opposition to the request for leave to file the Second Amended Complaint. The hearing on this new motion to amend is scheduled for January 25, 2012.

*DISCUSSION*

Pursuant to the General Corporation Law of the State of Delaware, the directors of a corporation are charged with managing the business and affairs of a corporation. *In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing 8 Del. C. §

9

141(a)).  In managing a corporation, those directors have fiduciary duties to the corporation and

its shareholders.  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds

by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  The duties are of due care and loyalty.  *See Stone

v. Ritter*, 911 A.2d 362 (Del. 2006).  Although, the concept of "good faith" traditionally had been

viewed as an independent, third-fiduciary duty of corporate directors, more recently good faith

considerations have been subsumed within the analysis of the duty of loyalty.  *Stone*, 911 A.2d at

370.

*Duty of Care*

"The fiduciary duty of due care requires that directors of a Delaware corporation use that

amount of care which ordinarily careful and prudent men would use in similar circumstances,

and consider all material information reasonably available in making business decisions."  *In re

Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del Ch. 2005) ("*Disney* I") (citations and

internal quotations omitted).  However, directors' deficiencies in meeting these requirements are

"actionable only if the directors' actions are grossly negligent."  *Id*.  In this context, gross

negligence has been defined as a "reckless indifference to or a deliberate disregard of . . .

stockholders" or "actions which are with out the bounds of reason."  *Id*. at 750 (citations and

internal quotations omitted).

The two contexts in which liability for a loss may be the consequence of a breach of the

duty of care are (i) where a board "*decision*" was ill advised or the result of negligence, and (ii)

where there was "an *unconsidered failure of the board to act* in circumstances in which due

attention would, arguably, have prevented the loss."  *Id*. at 749 (emphasis in original).  A

board's "*conscious decision to refrain from acting*," however, may be a valid exercise of its

10

business judgment.  *Id*. at 728 n. 416. (emphasis in original).

The duty of care concerns the director's obligation "to act on an informed basis."  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1993).  This duty is breached if, before voting with respect to a significant transaction, the director was not fully informed concerning it or failed to fully consider it.  *Id*. at 368.  In reviewing a director's compliance with his duty of care, the court does not consider the content of the decision where the process employed was rational and used in a good faith attempt to promote corporate interests.  *Disney I*, 907 A.2d at 749-50.

### *Duty of Loyalty*

The duty of loyalty requires that the corporation's best interest must take precedence over any interest of the director that is "not shared by the stockholders generally."  *Cede*, 634 A.2d at 361.  A director may not use his "position of trust and confidence" to further a "private interest," as there may not be a conflict between a director's duty and his self-interest.  *Disney I* , 907 A.2d at 750-51.  The "[c]lassic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."  *Cede*, 634 A.2d at 362.  A director is considered independent concerning a decision if it "is based entirely on the merits of the transaction and is not influenced by personal or extraneous considerations.  *Id*.  An example of an extraneous consideration or influence would be where one director controls another.  *In re Alloy, Inc. Shareholders Litig*. 2011 WL 4863716 at *7 (Del. Ch. 2011).  With respect to an individual director, the alleged "disqualifying self-interest or lack of independence must be material," that is, "reasonably likely to affect the decision-making process of a

11

reasonable person." *Id*. In instances where promoting a transaction would confer a substantial benefit upon a director, such director could not objectively be considered disinterested or independent. *Cede*, 634 A.2d at 362. To support a breach of loyalty claim, there must be a factual showing that "a majority of the board of directors was not both disinterested and independent." *Alloy*, 2011 WL 4863716 at *7. *See also In re Lukens Inc. Shareholders Litig.*, 757 A.2d 720, 730 (Del. Ch. 1999) (noting that when one director is interested in the transaction, without any allegation that the interested director "controlled of majority of the board, there is no basis to say that the board as a whole lacked independence"). However, it may be sufficient if the complaint contains well-pled allegations that the board failed to act in good faith. *Id*. at *7.[3] Thus, even with majority approval by disinterested and independent directors, a breach of the duty of loyalty may be found if the challenged decision "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Id*.

---

[3]Section 144(a) of the Delaware General Corporate Law validates a transaction between a corporation and its directors or officers if approved by a majority of the independent directors, where those approving directors:

    (1) are aware of the conflict,
    (2) are aware of all facts material to the transaction; and
    (3) act in good faith.

In reviewing the implications of this section on inside transactions, the *Disney I* court emphasized why, apart from traditional notions of the duties of care and loyalty, good faith would play an important role in protecting shareholder interests.

> [T]he inside transaction is valid where the independent and disinterested (loyal) directors understood that the transaction would benefit a colleague (factor 1), but they considered the transaction in light of the material facts (factor 2—due care) mindful of their duty to act in the interests of the corporation, unswayed by loyalty to the interests of their colleagues or cronies (factor 3—good faith). On the other hand, where the evidence shows that a majority of the independent directors were aware of the conflict and all material facts, in satisfaction of factors 1 and 2 (as well as the duties of loyalty and care), but acted to reward a colleague rather than for the benefit of the shareholders, the Court will find that the directors failed to act in good faith and, thus, that the transaction is voidable. In such a case, the duties of care and loyalty, as traditionally defined, might be insufficient to protect the equitable interests of the shareholders, and the matter would turn on the good faith of the directors.

*Disney I*, 907 A.2d 756 n.464.

12

The duty of loyalty requires a directors "undivided loyalty to the corporation" to protect its interests. *Disney I*, 907 A.2d at 751. The director must "refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage." *Id*. To act loyally to a corporation, a director must have "the good faith belief" that the actions he takes are in the best interest of the corporation. *Stone*, 911 A.2d at 370. In alleging that a director breached his duty of loyalty, the element of the director's scienter must be pled with particularity. *Goldman*, 2011 WL 4826104 at *14 (Del Ch. 2011).

### Good Faith

Good faith equates to "honesty of purpose" and requires a "genuine care" for one's constituents. *Disney I*, 907 A.2d 753. A director fails to act in good faith where the director *intentionally* (i) acts with a purpose other than that of advancing the corporations' best interest, (ii) acts to violate applicable law, and (iii) fails to act in the face of a known duty to act thereby showing conscious disregard for his duties. *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("*Disney* II") (citation omitted). These intentional actions would constitute a conscious disregard of duties. *Disney I*, 907 A.2d at 755.

Where an action is taken with the intent to harm a corporation, it is a disloyal act in bad faith. *Id*. at 753. In addition, good faith may be absent where the conduct "falls between 'conduct motivated by subjective bad intent,' and "conduct resulting from gross negligence." *Goldman*, 2011 A.3d 4826104 at *13 (quoting, *Disney II*, 906 A.2d at 66). Thus, conduct that is "more culpable than simple inattention or failure to be informed of all material facts" relevant to a transaction may be a conscious disregard that amounts to bad faith. *Id*. at *13. To constitute a failure to act in good faith, the conduct at issue must be "qualitatively different from, and more

13

culpable than [gross negligence]," as the latter conduct by itself would amount to a breach of the fiduciary duty of care. *Id.*, at \*13 (quoting, *Stone,* 911 A.2d at 369; *see also Disney II*, 906 A.2d at 65 (noting that by itself, conduct that constitutes gross negligence is not considered a failure to act in good faith).

As it relates to the *intent* to do harm, or to consciously disregard one's duties, there must be particularized allegations of fact that show "that the directors acted with scienter, *i.e.*, there was an 'intentional dereliction of duty' or "a conscious disregard' for their responsibilities, amounting to bad faith." *Goldman*, 2011 A.3d at \*12 (quoting *Disney I*, 907 A.2d at 755). In the transactional context, to establish that a disinterested director intentionally disregarded his duties requires "an extreme set of facts." *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009). If the director merely failed to do everything they should have under the circumstances, that would be a breach of the duty of care. *Id.* (noting that "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties"); *see also Citigroup*, 964 A.2d at 128 (noting that bad business decisions are not the same as bad faith conduct from consciously disregarding duties). It is only where a director "knowingly and completely failed to undertake his responsibility" that a breach of duty of loyalty is implicated. *Lyondell*, 970 A.2d at 243-44.

With respect to *inaction* by the directors, only a showing of a "sustained or systemic failure of a director to exercise reasonable oversight" will suffice to show the requisite absence of good faith. *Disney I*, 907 A.2d at 750. The standard of liability for violations of the duty of care because of inaction has been described as "extremely high." *Id.*, 907 A.2d at 750. The "demanding test" required in the "oversight" context serves to encourage qualified candidates to

14

serve as directors.  *Id.* (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967-68).[4]

*Exculpation Provisions*

Section 102(b)(7) of the General Corporation Law of Delaware allows a corporation to include in its certificate of incorporation a provision that eliminates or limits the liability of a director with certain exceptions.  The exceptions from exculpation relevant to this matter are "(i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; . . . (iv) for any transaction from which the director derived an improper personal benefit." 8 Del. Ch. § 102(b)(7).  The purpose of a section 102(b)(7) provision is "to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations and certain other conduct." *Disney I*, 907 A.2d at 751-52 (citation omitted).  Thus, "to the extent that directors have engaged in conscious wrongdoing or in unfair self-dealing, the exculpatory charter provision does not insulate them from fiduciary duty claims." *Id.* at 795.

Section 102(b)(7) is intended to encourage directors to pursue business strategies that

---

[4]For purposes of oversight, the directors must implement an information and reporting system that is adequate to ensure that appropriate information is timely brought to the directors' attention. *Stone*, 911 A.2d at 368. While the *Disney* and *Caremark* courts speak of oversight liability in the context of the duty of care, the *Stone* court treats it as a director's breach of the duty of loyalty by "failing to discharge that obligation in good faith." *Stone*, 911 A.2d at 370.  In any event, the *Stone* court adopts the *Caremark* standard to establish liability in the oversight context. *Lyondell*, 970 A.2d at 243.  As set forth by the *Stone* court, the *Caremark* standard requires a showing that "the directors (a) utterly failed to implement any reporting or information system or controls or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370.  Moreover, "imposition of liability requires a showing that the directors *knew* that they were not discharging their fiduciary obligations." *Lyondell*, 970 A.2d at 243.  (emphasis added).  Indeed, bad faith is a required element for director oversight liability. *Stone*, 911 A.2d at 370.

may be risky but that hold the potential for value maximization. *Id*. at 752. Thus, as long as the directors efforts to pursue such strategies are made in good faith, their actions are protected by section 102(b)(7). *Id*. Indeed, the application of an exculpation provision is "most useful" when, despite a directors good faith efforts to pursue a business strategy, the effort proves unsuccessful financially, resulting in a potentially biased "hindsight" evaluation of the director's action, improperly influenced by the unsuccessful outcome. *Id*.

An exculpation provision protects a director from due care claims brought by the corporation, including derivative claims, as well as from claims by creditors. *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 776-77, 793-94 (Del Ch. 2004). Indeed, limiting creditors to the same rights afforded shareholders is consistent with the creditors' ability to protect themselves through contracting and fraudulent conveyance laws. *Id*. at 777.

Asserting exculpation from liability pursuant to section 102(b)(7) is an affirmative defense, and the director seeking application of the section has the burden to establish entitlement to its protection. *Disney I*, 907 A.2d at 752-53. Nevertheless, the protection of the exculpation provision may be asserted on a motion to dismiss. *Alloy*, 2011 WL 4863716 at *5 n.19. In an action against a corporation with a section 102(b)(7) exculpatory provision, "the complaint must state a nonexculpated claim, *i.e.*, a claim predicated on a breach of the directors' duty of loyalty or bad faith conduct." *Id*. at *7.

As noted, in considering either the duty of care or loyalty, good faith is a factor. However, grossly negligent conduct, including the failure to inform oneself of available material facts, without more, may not constitute a failure to act in good faith. *Disney II*, 906 A.2d at 64-

16

65.[5]  This premise stems, in part, from the ability of a corporation to exculpate its directors for

monetary liability for breaches of the duty of care but not from conduct that fails to comply with

the obligation to act in good faith.  *Id*. at 65 (noting that if an act or omission that violated the

duty of care were automatically treated as lacking in good faith, the protections afforded by

section 102(b)(7) would be eliminated).  Indeed, acts not in good faith, whether related to the

duty of care or loyalty, aren't exculpated because "they are disloyal to the corporation."  *Disney*

*I*, 907 A.2d at 755-56 n. 463.

*Business Judgment Rule*

The directors' management of a corporation is advanced by application of the business

judgment rule, which is a presumption that business decisions made by corporate directors are

made on an informed basis, in good faith and in the honest belief that actions taken are in the

corporation's best interest.  *Walt Disney II*, 906 A.2d at 52.  The presumption serves to preclude

a court from unreasonably imposing its views with respect to corporate decisions.  *Disney I*, 907

A.2d at 747 (citations omitted).  As long as fraud, bad faith or self-dealing are not present, the

presumption applies.  *Id*.  The board's decision is valid if it serves any "rational business

purpose."  *Id*.  *See also Caremark*, 698 A.2d at 967 n.15. (citing, American Law Institute,

Principles of Corporate Governance § 4(c) (noting that for the business judgment rule to apply,

the director "must 'rationally' believe that the decision is in the best interests of the

corporation").  In the absence of allegations of interestedness or disloyalty to the corporation, the

rule precludes a court from second-guessing the decision of the directors as long as they utilized

---

[5]Although, as set forth in the next section, to avail itself of the business judgment presumption the board is required "to *reasonably* inform itself."  *Goldman*, 964 A.2d at *16 .

17

a "rational process" to reach their decision and "availed themselves of all material and reasonably available information." *Citigroup*, 964 A.2d at 124. *See also Goldman*, 964 A.2d at *16 (noting that the board is only required "to *reasonably* inform itself") (emphasis in original). With respect to whether directors were adequately informed, there must be particularized allegations of fact that cast reasonable doubt concerning the directors' good faith. *Goldman*, 2011 WL 4826104 at *15

If a business decision was made in good faith, it is the *process* employed to reach the decision, not the decision itself, that is at issue. *Disney I*, 907 A.2d at 750 (citing *Caremark*, 698 A.2d at 967-98). Indeed, even if, in hindsight, a court does not agree with the substantive decision made in good faith by the board, there is no basis for director liability because the court should not substitute its view for that of the elected board. *Id*. Certain corporate decisions are core functions of the board of directors exercising business judgment, including compensation decisions, *Goldman*, 2011 A.3d 4826104 at *14, and decisions to purchase or allow others in the company to purchase certain investment assets. *Citibank*, 964 A.2d at 136 n. 96.

The protections of the business judgment rule do not apply to director inaction, where the standard for liability is gross negligence. *Disney I*, 907 A.2d at 748. However, as previously noted, a *conscious decision* to refrain from acting may be a valid exercise of business judgment.

The party challenging the directors' decision has the burden to rebut the business judgment presumption. *Id*. The presumption afforded by the business judgment rule may be rebutted by showing "that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith." *Disney II*, 906 A.2d at 52. If the presumption is rebutted, then the burden shifts to the directors to show "that the challenged act or transaction was entirely fair to the

corporation and its shareholders." *Id*.

*Corporate Waste*

To state a claim for corporate waste under Delaware law, stringent requirements must be met. *Citibank*, 964 A.2d at 136. The party challenging a transaction made pursuant to a board decision has the burden of proving that "the exchange was 'so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" *Disney II*, 906 A.2d at 74 (citing *Brehm v. Eisner*, 746 A.2d at 263. Corporate waste is present only in "unconscionable" cases where corporate assets have been "irrationally squander[ed]" or given away. *Id*. The burdensome standard naturally follows from the precept, under the business judgment rule, that decisions of the board of directors are upheld unless not attributable to any rational business purpose. *Id*.

Committing corporate waste is an act in bad faith. *Disney I*, 907 A.2d at 749 n.422. Thus, facts must be pled that overcome the presumption of good faith. *Citibank*, 964 A.2d at 137. The directors' decision must be shown to be egregious or irrational to the extent that it could not possibly have been based on a valid judgment concerning the best interest of the corporation. *Id*. at 136. Indeed, one must surmount a "high hurdle" to prove corporate waste. *Disney II*, 906 A.2d at 75.

Corporate waste is not found where there is "*substantial* consideration received by the corporation" and where "there is a *good faith judgment* that in the circumstances the transaction is worthwhile." *Goldman*, 2011 A.3d 4826104 at *16. Delaware corporate directors have broad discretion to make business decisions, including compensation decisions. *Citibank*, 964 A.2d at 138. Absent bad faith on the part of the directors, courts are not suited to second-guess their

19

business decisions and weigh whether the consideration received was adequate.  *Goldman*, 2011 WL 4826104 at *18.

*The Relevant Counts*

In the counts of the Complaint relevant to the motion before the Court, the Distributing Agent alleges that, after the merger of IFL into Marakon, as directors of the surviving Trinsum entity, the Trinsum Directors authorized certain transactions that breached their fiduciary duty (Count III) and constituted corporate waste (Count IV).  Specifically, the Distributing Agent contends that the Trinsum Directors authorized the transfer of the Victoria Fund to the insider-owned QFR for, what the Distributing Agent alleges was, "little or no consideration."  The additional transfers at issue consist of incentive payments made to certain IFL principals and employees, allegedly with Marakon funds, in the aggregate amount of approximately $5 million.

In the Initial Complaint, in addition to the counts contained in the Complaint currently before the Court, the Distributing Agent had asserted certain counts alleging gross negligence. However, after the directors raised the defense of the exculpatory provision contained in Trinsum's certificate of incorporation, the Distributing Agent eliminated the gross negligence claims when she filed the current Complaint.

In addition, recognizing that the section 102(b)(7) exculpation provision shields the directors from liability for money damages for duty of care violation, the Distributing Agent attempts to set forth allegations that would fall within the exception to the exculpation provision as "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."  Specifically, the Distributing Agent alleges that the transfer of the Victoria Fund to QFR was a fraudulent transfer in violation of New York law as it "was a transfer of

20

assets for less than fair consideration at a time when Trinsum was insolvent."  Further, the

Distributing Agent alleges that "the Board of Directors knew that its acts were illegal."

*The Directors' Decisions*

Absent fraud, bad faith or self-dealing, the business judgment rule affords directors the

benefit of the presumption that their corporate decisions are made on an informed basis, in good

faith and in the honest belief that actions taken are in the corporation's best interest.  The

corporate decisions at issue here are the decision to sell a corporate asset, the Victoria Fund, and

the decision to make the incentive payments.

As previously noted, the duty of care concerns an obligation to act on an informed basis.

A director must be fully informed and fully consider the action to be undertaken.  The

Distributing Agent alleges that the Trinsum Directors appointed Daza, who had an interest in

QFR, as the person to negotiate the sale of the Victoria Fund to QFR, which sale gained

unanimous approval of the board of directors, including Daza.  She further alleges that, other

than the work performed by Daza, who was an interested party, none of the other Trinsum

Directors did any due diligence or obtained any professional assistance concerning the value of

the Victoria Fund prior to its sale.

There is no allegation that the Trinsum Directors were not informed of Daza's interest in

QFR.  In addition, while acknowledging that the Trinsum Directors unanimously voted to

approve the sale, there are no allegations addressing the process employed by the Trinsum

Directors to reach their decision concerning the sale.  The Distributing Agent acknowledges the

economics and financial background of various directors, including Merton, whom she describes

as "a business school professor and distinguished economist."  Thus, she does not allege that

they were incapable of valuing assets to be sold.  Rather, the allegations are that they failed to be

fully informed and fully consider all the options by failing to do adequate due diligence and to

obtain professional assistance to value the Fund prior to its sale.  Therefore, she alleges, in a

conclusory manner, that they did not adequately perform due diligence and failed to do

everything they should have done, and as a result, their efforts were flawed in approving the sale.

Even aside from her failure to consider the Trinsum Directors' ability to value financial

assets, all of these allegations address the issue of the Trinsum Directors' alleged inadequacy in

performing due diligence and fully informing themselves.  As such, at most, the allegations are

that the directors were grossly negligent by not fully informing themselves and approving a

decision reached by the interested director.  As noted, the Trinsum certificate of incorporation

includes an exculpation provision that protects directors, with certain limited exceptions, from

personal liability for violations of the breach of duty of care.[6]

With respect to the incentive payments made, the allegations are that there was no

obligation to make the payments and that they were made notwithstanding opposition from

Trinsum's CFO.  The Distributing Agent further alleges that the payments were made with

---

[6]The Distributing Agent argues that the *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgport Holdings, Inc.)* 388 B.R. 548 (Bankr. D. Del. 2008) court concluded that a liquidating trust adequately alleged facts to support its claim that the directors were disloyal and acted in bad faith by abdicating decision making authority to the recently appointed chief operating officer, "then failing adequately to monitor his execution of a [sales' strategy], which resulted in an abbreviated and uninformed sale process; and approving the sale . . . for grossly inadequate consideration." *Id.* at 565.  In referencing the failure to "monitor" the sale, the *Bridgeport* court was addressing oversight liability.  As previously noted, bad faith is a required element to establish oversight liability.  Here, as subsequently discussed, the Court concludes that the Complaint does not contain sufficient allegations to support a claim of bad faith.  In regard to monitoring the sale of the Victoria Fund, there are no allegations that the Trinsum Directors were unaware of Daza's interest in QFR.  In addition, the Complaint recognizes the financial and economic sophistication of various of the Trinsum Directors, and presumably their expertise in valuing the assets.  Moreover, in the *Bridgeport* case, there were allegations that the asset at issue was sold for grossly inadequate consideration because it had been valued at four times the purchase price by the purchaser's board of directors, as well as in publicly available opinions of financial market analysts.  *Id.* at 565-66.  Here, there are no allegations concerning the value of the Victoria Fund at the time of the sale to allow for an evaluation of whether the consideration was adequate.

Marakon funds at a time when it was insolvent.  There is no allegation that the Trinsum

Directors were unaware of the CFO's opposition to the payments or that they were incapable of

determining appropriate payment amounts to be made.  The allegations concern a disagreement

with the substance of the decision, not the process undertaken to reach that decision.  The

allegations concerning the incentive payments are insufficient to support a breach of duty of care

claim.

With respect to the sale of the Victoria Fund and the duty of loyalty, the Distributing

Agent indicates that director Daza could not be considered disinterested because, based upon his

interest in QFR, he does appear on both sides of the transaction.  Nevertheless, all of the other

directors, with no conflicting interest, approved the transaction.  There are no allegations that

Daza controlled the other directors.  In fact, the allegation in the Complaint is that the Marakon

Directors controlled Trinsum because Marakon retained 51% interest in Trinsum.  Thus, the

allegations fail to support an inference that a majority of the board was not disinterested and

independent.  In addition, there is an absence of any allegation from which to infer that the

majority of the disinterested and independent directors had any motivation to approve a sale that

would work injury to Trinsum or deprive it of profit or advantage.

Aside from the absence of allegations challenging the disinterestedness and independence

of the majority of directors, the allegations are insufficient to support an inference that the

challenged decision violated the duty of loyalty because it was "beyond the bounds of reasonable

judgment" and is not capable of being explained other than as an act of bad faith.  The

Distributing Agent includes a conclusory allegation that the receipt of the 10% revenue stream

for the sale of the Victoria Fund was "essentially nothing."  However, there are no allegations in

the Complaint that provides any basis upon which to value the Victoria Fund.  Moreover, the

10% revenue stream that Trinsum received in the transaction represented a 10% payment from

revenue, without that revenue being reduced by expenses.  QFR would be responsible for all

expense obligations.  More specifically, there are no allegations that provide a basis upon which

to evaluate how the 10% revenue stream, with no deductions for expenses, compared with the

value of the Victoria Fund.[7]

In an effort to show the absence of good faith and the breach of the duty of loyalty, as

well as the inapplicability of the exculpation provision, the Distributing Agent argues that the

Trinsum Directors knowingly violated the law by transferring the Victoria Fund for less than fair

consideration at a time when Trinsum was insolvent.  The Distributing Agent contends that this

was a fraudulent transfer violating New York law.  The Distributing Agent further alleges that

the board of directors knew that the sale of the Victoria Fund was illegal.

The claim that the transfer of the Victoria Fund violated the law is based upon allegations

of a constructive fraudulent conveyance under New York law.  In the Complaint, the

Distributing Agent alleges that the sale of the Victoria Fund "was a transfer of assets for less

than fair consideration at a time when Trinsum was insolvent."  The Distributing Agent,

however, has not alleged any particularized facts to support these conclusory allegations.  First,

there are no allegations concerning Trinsum's solvency at the time of the transfer.  Rather, all

---

[7]Moreover, the Trinsum Directors' unanimous approval of the sale of the Victoria Fund was an instance of discrete decision-making protected by the business judgment rule.  As such, the Distributing Agent takes issue with the Trinsum Directors' alleged failure to be fully informed or fully consider alternatives to the sale to QFR.  These allegations concerning flawed or inadequate efforts are duty of care issues for which the directors are protected from personal liability by the exculpation provision.

Thus, it does not appear that "oversight" is at issue, however, even if the claims could be deemed oversight liability claims for failure to "monitor" the sale process, allegations would be required that the directors *consciously* failed to monitor or oversee, thereby preventing them from learning of risks or other problems that required their attention.  Any such claims would require allegations of bad faith.  The allegations in the Complaint are insufficient.

allegations concerning Trinsum's insolvency relate to other periods of time.  In addition, as previously discussed, there are no allegations concerning the Victoria Fund's value from which to determined whether the receipt of the 10% revenue stream was not fair consideration.

More importantly, the allegation directed to the putative violation of the New York constructive fraudulent transfer law concerns a provision for which the conveyor's actual intent is irrelevant.  For example, under New York Debtor & Creditor Law § 273, a conveyance that renders one insolvent is a fraudulent conveyance as to that person's creditors regardless of the conveyor's "actual intent" when the conveyance lacks fair consideration.  *See* N.Y. DEBT. & CRED. LAW § 273.  Thus, the transferor's knowledge is irrelevant to the applicability of the section.  However, with respect to the violation of a director's fiduciary duty of loyalty and the director's good faith obligations, there must be particularized allegations that the director acted with scienter.  In addition, with respect to misconduct or violations of the law, it is only when there has been "*intentional* misconduct or a *knowing* violation of law" that the exculpation provision does not protect a director from personal liability.  8 Del. Ch. § 102(b)(7) (emphasis added).  Therefore, it does not appear that allegations concerning a violation of a law that would not actually call into question a director's good faith would be sufficient to support an allegation of intentional conduct amounting to bad faith or a breach of the duty of loyalty or to a *knowing* violation of the law.

To recapitulate, authorizing the sale of corporate assets is properly within the scope of a director's function as a valid exercise of business judgment.  Where an exculpatory provision applies, a director's decision in that regard is only subject to challenge if there are allegations to support disloyalty, lack of good faith, *intentional* misconduct or *knowing* violations of the law.

25

There are no particularized factual allegations to support any claims to that effect.

An allegation that a director breached its fiduciary duty by a conscious disregard of such duty must be plead with particularity.  A director must have knowingly and completely failed to take on his responsibility. There are no allegations that the Trinsum Directors knowingly failed to undertake their responsibility or that they knowingly violated the law, or otherwise engaged in intentional misconduct.

With respect to the incentive payments, there are no allegations that any of the Trinsum Directors were not disinterested or independent.  Specifically, there are no allegations that the Trinsum Directors would personally benefit from such payments or that benefitting parties controlled the directors.  Moreover, compensation decisions are at the core of a director's responsibility.  There are no allegations that the Trinsum Directors were unaware of the CFO's opposition to the payments.  Further, there are no allegations challenging the process utilized by the directors prior to authorizing the incentive payments.  The allegations only challenge the substance of the decision, for which the directors are protected by the business judgment rule and the exculpation provision.

The allegations of the Complaint are not sufficient to support a claim that the Trinsum Directors lacked good faith or breached their duty of loyalty.  Moreover, the Complaint fails to allege intentional misconduct or knowing violation of the law.  As such, the Trinsum Directors decisions to authorize the sale of the Victoria Fund and to authorize incentive payments are protected by the business judgment rule.  Further, the exculpation provision protects the Trinsum Directors from any remaining claims that are premised upon breaches of their duty of care. Accordingly, Count III of the Complaint is dismissed.

Furthermore, inasmuch as facts have not been pled to overcome the presumption of good faith, the corporate waste claim must also be dismissed. Absent allegations of bad faith, a court will not substitute the director's decision with a hindsight-based decision. As previously noted, there are no allegations concerning the value of the Victoria Fund, therefore no inference can be drawn that the receipt of 10% of the revenue stream for the sale of the fund was inadequate consideration. Certainly, there are no allegations from which to infer that the sale of the Victoria Fund was one-sided or that corporate assets were irrationally squandered or that the decision to authorize the sale was irrational. Thus, the allegations are not sufficient to support a claim for corporate waste. Similarly, corporate directors have broad discretion in making compensation decisions and in the absence of allegations of bad faith, or a sufficient basis upon which to infer that the decision was irrational, a court will not weigh the adequacy of the consideration received for the authorized payments. Accordingly, Count IV of the Complaint is dismissed.

### *Request for Leave to Amend*

In her memorandum in support of her opposition to the Motion, the Distributing Agent requested that any dismissal be accompanied by authorization to again amend the Complaint. However, certain of the Trinsum Directors have requested that any dismissal be with prejudice. As previously noted, prior to the issuance of this decision, the Distributing Agent filed a motion, on December 1, 2011, seeking leave to file a Second Amended Complaint, attaching a copy of the proposed Second Amended Complaint to the motion. The Trinsum Directors filed opposition to the request for leave to file the Second Amended Complaint.

Federal Rule of Civil Procedure 15(a) requires that leave to amend a pleading be freely given. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). However,

a court will not allow an amendment of a pleading if there has been undue delay, bad faith or dilatory motive in proposing the amendment, if there has been repeated failure to cure the deficient pleading in previous amendments, if there would be undue prejudice to the opponent in allowing the amendment, or if the amendment would be futile. *Id.*

The proposed Second Amended Complaint includes additional information gleaned from an October 31, 2006 report (the "Cohn Report") issued by Marakon's accountant J.H Cohn LLP, based upon projections provided by the Marakon and IFL directors prior to the merger.[8] The information in the Cohn Report was available to the Distributing Agent prior to her filing of the earlier complaints as she referenced other aspects of it in those complaints. The proposed Second Amended Complaint includes an allegation concerning profit projections for the Victoria Fund. The projections were allegedly supplied "only months before the sale [of the Victoria Fund]" as part of the due diligence for the merger.

First, the referenced projections were made in the third quarter of 2006 and were based upon speculation as to the volume of assets that would come under the management of the Victoria Fund by the end of the following year and the rate of return. Relying upon the projections of what potentially could have occurred at the end of 2007, the Distributing Agent alleges that in October 2006 the Trinsum Directors envisioned revenue of 21.3 million dollars per year. The Distributing Agent alleges that expenses were approximately 8 million. However, these projections were generated several months prior to the March 2007 sale of the Victoria Fund and, as described by the allegations, were projections of events to occur, in part, at the end

---

[8]The Distributing Agent also included certain additional information concerning solvency; however, with respect to Counts III and IV of the Complaint, the amendment does not remedy the absence of allegations concerning Trinsum's solvency at the relevant time of the sale of the Victoria Fund.

of the following year.

Absent from the proposed Second Amended Complaint are any allegations concerning the market conditions at the time the decision was reached to sell the Victoria Fund in March 2007.  Market conditions are subject to constant flux that may greatly impact valuations. Inasmuch as the allegations are that the pre-merger directors, who provided the projections for the Cohn Report, were Trinsum Directors at the time of the sale of the Victoria Fund, they were aware of those earlier projections when subsequently evaluating the sale.  The sale of the fund occurred over five months after those projections were generated and there are no allegations concerning the Trinsum Directors' evaluation of projected revenues at the time of the sale of the Victoria Fund.  There are no allegations that market and other conditions remained stagnant from October 2006 to March 2007 or that the earlier projections as to the volume of funds that would come under management or other factors were materializing.  Thus, there are no particularized allegations concerning the value of the Victoria Fund at the time of its sale to support the conclusory allegation that the sale of the fund for 10% of the revenue stream, free of expenses, as payment was inadequate consideration for the sale.

More importantly, with respect to the violation of a director's fiduciary duty of loyalty and the director's good faith obligations, the proposed Second Amended Complaint does not include any particularized allegations that the directors acted with scienter.  Therefore, even if the amendment were allowed, for the reasons previously discussed, the allegations in the Second Amended Complaint are insufficient to support a claim of intentional conduct amounting to bad faith or a breach of the duty of loyalty or to a *knowing* violation of the law.[9]  Thus, as concerns

---

[9]Nor would the additional allegations in the proposed Second Amended Complaint impact any of the Court's conclusions concerning the duty of care or corporate waste.

Counts III and IV of the Complaint, leave to allow the filing of the Second Amended Complaint would be futile. Therefore, the motion for leave to amend with respect to those counts is denied and those counts are dismissed with prejudice.

*Conclusion*

The Trinsum Directors exercised their business judgment in determining to authorize the sale of the Victoria Fund and to authorize the incentive payments. As such, those decisions are entitled to the presumption that they were made on an informed basis, in good faith and in the honest belief that the actions were taken in the corporation's best interest. There are no allegations set forth in the Complaint to rebut that presumption.

The Court concludes that the Complaint does not adequately allege that the Trinsum Directors breached their duty of loyalty, acted in bad faith, committed either *intentional* misconduct or a *knowing* violation of law. The Court further concludes that because there was an exculpation provision in the corporation's certificate of incorporation, as permitted by the law of the state of Delaware, and because the Complaint does not adequately allege a lack of good faith, breach of duty of loyalty, the commission of intentional misconduct or knowing violation of the law on the part of the Trinsum Directors, they could not be found personally liable for monetary damages for any alleged breaches of the fiduciary duty of care or corporate waste. In addition, the allegations of the Complaint are insufficient to support a claim of corporate waste.

Finally, the proposed amendments, as set forth in the Second Amended Complaint, would be unavailing to protect Counts III and IV from dismissal.

Therefore, with respect to Counts III and IV of the Complaint, the Distributing Agent's motion to file the Second Amended Complaint is denied. Further, Counts III and IV of the

Complaint are dismissed, with prejudice.

The Trinsum Directors are to settle an order consistent with this Opinion.

Dated: New York, New York
        January 20, 2012

**s/Arthur J. Gonzalez**
CHIEF UNITED STATES BANKRUPTCY JUDGE